UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MARK HATFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 14-10445-DPW |
| | ) | |
| BLUE CROSS AND BLUE SHIELD | ) | |
| OF MASSACHUSETTS, INC., and | ) | |
| LAHEY CLINIC HOSPITAL, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM AND ORDER
February 10, 2016

Plaintiff Mark Hatfield ("Hatfield") brought this action against Defendants Blue Cross and Blue Shield of Massachusetts, Inc., and Lahey Clinic Hospital, Inc., under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).  He challenges on both procedural and substantive grounds Blue Cross's denial of health insurance benefits for residential substance abuse and mental health treatment from April 9, 2010 through March 29, 2011.  Before me are the parties' cross-motions for summary judgment.

1

## I. BACKGROUND

### A.  *Factual Background*

#### 1.  Plan Coverage

During the relevant time period, Hatfield was insured under a health benefits plan (the "Plan") provided by the Lahey Clinic Foundation, Inc. ("Lahey") to its employees and their families. Hatfield's mother, Kathaleen Hatfield, was a Lahey employee.[1] The terms of the agreement between Lahey and Blue Cross are set forth in an Administrative Services Account Agreement (the "Agreement").  Because the Plan was self-insured, Blue Cross was retained to serve only as a third-party claims administrator. The Agreement provides that: "Blue Cross and Blue Shield will administer health care benefits for Covered Members as long as they meet the eligibility requirements described in these Benefit Descriptions and as long as the applicable charges are paid."

The policy under which Hatfield was insured was a self-funded, managed care HMO plan — the Network Blue New England Plan — the terms of which are set forth in a Managed Care Plan Benefit Description (the "Plan Description").  Health care coverage under the plan is limited to "medically necessary"

---

[1] Although not formally parties to this litigation, Mark Hatfield's parents, Kathaleen Hatfield and Mark Hatfield, Sr., have been attentively involved in their son's treatment and particularly active in attempting to obtain coverage for it.

services provided by in-network providers within a specified
geographic area, except when emergency or urgent care is needed
or an out-of-network provider is otherwise approved. Hatfield's
coverage was generally limited to the HMO Blue New England
network.

Medically necessary services are those "required services
that a health care provider, using prudent clinical judgment,
would provide to a patient in order to prevent or to evaluate or
to diagnose or to treat an illness, injury, disease, or its
symptoms."  Among other criteria, medically necessary services
must be "[c]linically appropriate, in terms of type, frequency,
extent, site, and duration"; "[c]onsistent with the diagnosis
and treatment of [the] condition and in accordance with *Blue
Cross and Blue Shield medical policies* and *medical technology
assessment criteria*"; "[e]ssential to improve [the insured's]
net health outcome and as beneficial as any established
alternatives that are covered by *Blue Cross and Blue Shield*";
"furnished in the least intensive type of medical care setting
that is required by [the] medical condition"; and "[n]ot more
costly than an alternative service or sequence of services at
least as likely to produce the same therapeutic or diagnostic
results . . . ."  No benefits are provided for "[a] service or
supply that is not considered by *Blue Cross and Blue Shield* to
be *medically necessary* for [the claimant]."

3

As with other treatment and services under the plan, mental health treatment must be both medically necessary and furnished by a participating provider.  Although the policy provides coverage for alcohol and drug treatment facilities and detoxification facilities, among others, "services that are performed in educational, vocational, or recreational settings; and 'outward bound-type,' 'wilderness,' 'camp,' or 'ranch' programs," whether residential or nonresidential, are not covered by the plan.  "No benefits are provided for any services furnished along with one of these non-covered programs."

Inpatient services for a mental condition require advance approval by Blue Cross.  In addition, intermediate mental health treatments, such as acute residential treatment or intensive outpatient programs, must be provided in "[t]he least intensive type of setting that is required for [the insured's] condition" in order to be considered "medically necessary" by Blue Cross.

Blue Cross conducts a "utilization review" "to evaluate the necessity and appropriateness of [the insured's] health care services" "us[ing] a set of formal techniques that are designed to monitor the use of, or evaluate the clinical necessity, appropriateness, efficacy or efficiency of health care services, procedures, or settings and drugs."  In addition to employing its own set of medical necessity criteria and policies, Blue

Cross uses InterQual Criteria on Behavioral Health to determine if a level of care is medically necessary.

When a member disagrees with a coverage decision, the plan provides for internal and external review processes through a grievance program.[2]  In reviewing a coverage decision, Blue Cross considers the provisions, policies, and procedures of the health plan, "the health provider's input," and the member's "understanding and expectation of coverage by this health plan."

A decision in response to a member grievance must be in writing and must identify the applicable coverage terms, describe the specific medical and scientific reasons for the denial, and "specify any alternative treatment or health care services and supplies that would be covered."  It must also include the applicable clinical guidelines and review criteria and explain how to request an external review.

2.  Hatfield's Medical History and In-Patient Treatment

Hatfield, who was 22 years old in 2010, has struggled with substance abuse, bipolar disorder, and severe depression since his teenage years.  From age 19, he was periodically homeless. In March 2010, Hatfield was using cocaine "off and on," smoking four to five grams of marijuana daily, and episodically using

---

[2] External reviews are only available for certain types of coverage.  The parties do not dispute that the decision here was eligible for external review.

ecstasy over the course of multiple days.  His previous efforts to achieve sobriety and a stable mental condition had been unsuccessful.  These efforts included long-term outpatient treatment, several partial hospitalization or intensive outpatient detoxification programs, one acute residential treatment stay, and two inpatient admissions.

On April 3, 2010, Hatfield was admitted to a psychiatric inpatient facility at Hampstead Hospital in Hampstead, New Hampshire, following a suicide attempt.  This was his third suicide attempt and second admission to Hampstead Hospital for dual-diagnosis treatment.  According to the psychiatry admission notes at Hampstead, Hatfield lacked "coping strategies, emotion regulations and social skills necessary to function" and required "the structure and safety of an inpatient psychiatric milieu" due to his risk of self-harm.  On April 8, Hatfield was no longer experiencing suicidal ideations and was discharged from Hampstead.

Upon his departure from Hampstead, Hatfield was transported to the Burning Tree Recovery Ranch ("Burning Tree") in Kaufman, Texas, by his parents, who had learned of the facility through a family friend.  Burning Tree is "a working cattle ranch" that provides a long-term, residential substance abuse program, with stays ranging from eight to fourteen months based on addiction history and response to treatment.  Burning Tree maintains a

6

structured daily schedule of activities for residents for seventeen hours a day.  It is not part of the New England Blue network or any Blue Cross network.

Hatfield resided at Burning Tree from April 9, 2010 through March 29, 2011.  His treatment plan upon admission indicated that he lacked "life skills that promote recovery," "needs a relapse prevention plan," and "needs to stabilize mood and mental health issues," among other problems.  When Hatfield left Burning Tree, his discharge summary indicated that he had received chemical dependency education, had participated in a variety of group sessions, had met with a psychiatrist weekly, and had participated in group recreation, yoga, "big book lectures," and HIV/Hepatitis/STD Education, among other activities.

Hatfield's parents paid out-of-pocket for Hatfield's stay at Burning Tree.  The agreement between Hatfield and Burning Tree, which required Hatfield's father to sign as a guarantor, stated that the cost of "treatment tuition" averaged about $8,000/month.  Hatfield and his father were required to establish a medical account with a $3,000 initial deposit for medical needs and an allowance account for leisure activities. The agreement also provided for a variety of additional expenses, some optional and some mandatory, related to treatment and services, and required Hatfield and his father to

acknowledge that they were prepared to commit to the expenses that may be incurred with a lengthy residential stay.

### 3.  Denial of Coverage and Subsequent Appeals

Before the specific claim at issue was submitted, two closely related claims concerning Hatfield's stay at Burning Tree were submitted to Blue Cross and denied. On July 12, 2010, Burning Tree submitted claims to Blue Cross for room and board charges for Hatfield for the period of April 9, 2010 through June 8, 2010.  Blue Cross classified Burning Tree as a facility providing acute residential treatment and reviewed the claim for coverage as such.  On July 30, 2010, Blue Cross denied the request because the provider was "out of state non covered" and because Hatfield had "received these services either without a referral from [his] primary care physician or plan authorization."

On August 25 and 27, 2010, Blue Cross received a request for coverage of out-of-network individual psychiatric counseling sessions at Burning Tree from Hatfield's mother, accompanied by some medical records from Burning Tree.  However, Hatfield's mother subsequently withdrew this request because, at the suggestion of Blue Cross, the family chose instead to seek

reimbursement for the entire acute residential treatment
admission.[3]

The specific claim at issue in this litigation was
submitted on September 28, 2010, when Hatfield's parents
requested retroactive coverage for the out-of-network behavioral
health residential treatment dating back to Hatfield's admission
at Burning Tree on April 9, 2010.  Hatfield's father indicated
on the out-of-network request form that Burning Tree was a "dual
diagnosis facility" that could handle Hatfield's needs, and that
Burning Tree was similar to a facility in Connecticut where Blue
Cross had previously provided full coverage for Hatfield's
treatment.  He enclosed with the request form a copy of the July
30, 2010 claim summary denying coverage for room and board at
Burning Tree.

A licensed social worker, Mark Tucker, assigned the
InterQual criteria for chemical dependency and dual diagnosis to
Hatfield's claim.  After conducting a preliminary review using

---

[3] It appears that this or another claim for out-of-network
psychiatric counseling visits was processed and retroactively
reviewed by a board-certified psychiatrist.  On April 20, 2011,
the reviewer, Dr. Joel Shield, a behavioral health psychologist,
informed Hatfield that Blue Cross had determined that Hatfield's
out-of-network psychiatric counseling visits from January 7,
2011 onward were not medically necessary because "the situation
is not an emergency or urgent" and "the same service is
available in-network."  This review was based on the clinical
information provided by Hatfield's parents.  Hatfield was
informed of his right to appeal that decision.

the criteria, Tucker referred the claim to a physician reviewer,
Dr. Cornelia Cremens.  On October 28, 2010, Dr. Cremens informed
Hatfield that the requested coverage would be denied.  She
stated that she had reviewed the limited clinical information
received from Burning Tree and Hatfield's parents and had
applied the InterQual initial review criteria.  Although
Hatfield's clinical condition met the InterQual criteria for
outpatient therapy visits, he did not satisfy the criteria for a
substance abuse residential stay based on his potential safety
risk and role performance.

### a.  Internal Review of Denial Decision

On August 17, 2011, Hatfield's father appealed the decision
to deny coverage.[4]  On September 16, 2011, a grievance program
case specialist, John Lovell, notified Hatfield that a board-
certified physician in adult psychiatry and chemical dependency,
Dr. Karim Munir, had reviewed the claim and upheld the decision
to deny coverage.  According to the letter, Dr. Munir considered
the August 17, 2011 letter, the plan documents, the InterQual
criteria on chemical dependency and dual diagnosis inpatient
level of care, and the partial medical records provided by
Burning Tree.  The letter indicated that "[t]he request was

---

[4] On August 23, 2011, Blue Cross informed Hatfield that it had
received his letter and directed him to additional resources on
the grievance process and his right to appoint a representative
during this process.

denied because it does not meet the medical necessity criteria required for an acute chemical dependency inpatient treatment stay in the area of immediate safety risk." Instead, Hatfield was said to be eligible for intensive outpatient treatment. The letter informed Hatfield that he had exhausted the internal grievance process for this particular request, and that an "independent external review process" was available for further appeal.

On October 21, 2011, Hatfield's parents submitted 250 pages of documentation to Blue Cross in relation to their further appeal of the denial of benefits decision, and asked Blue Cross to reconsider the decision. Along with this documentation, Blue Cross received a letter from Dr. Michael Knight, Hatfield's treating physician at Hampstead, indicating that he agreed with Hatfield's decision to seek residential treatment because "lower levels of care had not been successful," and one from Dr. Marc Sadowsky, Hatfield's long-time therapist, recommending long-term residential treatment "[g]iven the lack of success of less restrictive treatments."

On November 16, 2011, Lovell notified Hatfield that the decision had been affirmed again because the request did "not meet the medical necessity criteria required for coverage of an inpatient chemical dependency rehabilitation stay in the areas of potential safety risk and relationships." The review was

conducted by another new physician, Dr. Brad Reich, who reviewed
the information previously available to physician reviewers, as
well as the additional information submitted in October 2011,
including the letter from Dr. Sadowsky and additional medical
records from Burning Tree.

b.  *External Review of Denial Decision*

Hatfield's parents requested an external review of the
decision on December 8, 2011.  A grievance program case
specialist forwarded the request to the Massachusetts Peer
Review Organization, Inc. ("MassPRO") with the internal review
case file and an explanation of the claim and why it had been
denied.  Hatfield's family and Burning Tree supplied MassPRO
with additional documentation for review.  MassPRO upheld the
denial of coverage decision on January 17, 2012.  A board-
certified physician in psychiatry and child and adolescent
psychiatry reviewed a number of documents, including Blue
Cross's statement of medical necessity, prior denial letters,
and clinical notes; the InterQual Review Summary; letters and
completed forms from Hatfield's parents; the letters from Drs.
Sadowsky and Knight; documentation from Hampstead Hospital; and
more robust documentation from Burning Tree than had been
available to previous reviewers.  The reviewer also considered a
chronology of Hatfield's medical history prepared by Hatfield's
parents, documentation regarding his previous participation in

12

residential treatment programs in 2008 and 2009, and other Blue Cross documents.

The external reviewer concluded that despite the "voluminous amount of data presented," there was insufficient evidence "that this young man's substance abuse could be treated adequately only in this residential facility rather than in a less restrictive intensive outpatient program." Accordingly, "[b]ased on the clinical information provided, MassPRO concur[red] that Mr. Hatfield's condition does not meet the InterQual medical necessity criteria for admission to an acute residential level of care in the area of potential safety risk and relationships." It therefore upheld the decision of Blue Cross to deny coverage for Hatfield's "substance abuse inpatient treatment stay" at Burning Tree from April 9, 2010 onward. Blue Cross then upheld its previous denial on February 21, 2012, following the decision of MassPRO.

## B.    *Procedural History and Instant Motions*

Hatfield filed this action in state court on November 11, 2013 alleging unlawful denial of benefits under ERISA § 502(a)(1)(B), codified as 28 U.S.C. § 1132(a)(1)(B), and seeking a declaratory judgment, restitution for losses, prejudgment interest, and attorney's fees and costs pursuant to

29 U.S.C. § 1132(g).[5]  Blue Cross thereafter removed the case to
federal court on the basis of federal subject matter
jurisdiction.  Hatfield filed an amended complaint (captioned as
the second amended complaint because of the filing of an earlier
amended complaint in the state proceeding) on April 22, 2014,
seeking relief for the denial of benefits under ERISA against
Blue Cross and Lahey.  After agreeing on the administrative
record, the parties filed cross-motions for summary judgment.
Following a hearing on these motions, I directed the parties to
file supplemental briefing on the potential value of a remand
and the availability of attorney's fees.

## II. STANDARD OF REVIEW

As I have observed previously, "[s]ummary judgment in the
ERISA context differs significantly from summary judgment in an
ordinary civil case."  *Petrone* v. *Long Term Disability Income
Plan for Choices Eligible Employees of Johnson & Johnson &
Affiliated Cos.*, 935 F. Supp. 2d 278, 287 (D. Mass. 2013).  I
"sit[ ] more as an appellate tribunal than as a trial court" and
must "evaluate[ ] the reasonableness of an administrative
determination in light of the record compiled before the plan
fiduciary."  *Leahy* v. *Raytheon Co.*, 315 F.3d 11, 17-18 (1st Cir.
2002).

---

[5] The parties agree that the plaintiff exhausted his
administrative remedies before pursuing this action.

The Supreme Court has stated that as a default rule "a denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a de novo standard." *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 115 (1989).  However, when an ERISA plan grants its plan administrator (or claims fiduciary) "discretionary authority to determine eligibility for benefits or to construe the terms of the plan at issue," judicial review is conducted under the arbitrary and capricious/abuse of discretion standard.  *Id.; see Wright* v. *R.R. Donnelley & Sons Co. Group Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005).  Under that deferential standard, the primary inquiry is "whether a plan administrator's determination 'is plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record.'"  *Colby* v. *Union Sec. Ins. Co.*, 705 F.3d 58, 61 (1st Cir. 2013) (quoting *Leahy*, 315 F.3d at 17).  The parties disagree whether Blue Cross has discretion to interpret the plan and determine benefits eligibility.

To obtain the deferential standard of review, the benefit plan at issue must "reflect a clear grant of discretionary authority to determine eligibility for benefits." *Leahy*, 315 F.3d at 15.  An explicit conferral of "full discretionary authority" on the plan administrator, as is found in many Blue Cross benefit plans, satisfies this requirement.  *See, e.g.,*

*Stephanie C.* v. *Blue Cross*, Civ. Action No. 13-13250-DJC, 2015 WL 1443012, at *7 (D. Mass. Mar. 29, 2015), *appeal filed* (No. 15-1531) (1st Cir. May 1, 2015); *Bonnano* v. *Blue Cross & Blue Shield of Mass., Inc.*, Civ. Action No. 10-11322-DJC, 2011 WL 4899902, at *7 (D. Mass. Oct. 14, 2011); *Jon N.* v. *Blue Cross Blue Shield of Mass., Inc.*, 684 F. Supp. 2d 190, 199 (D. Mass. 2010); *Smith* v. *Blue Cross Blue Shield of Mass., Inc.*, 597 F. Supp. 2d 214, 219 (D. Mass. 2009).

Such an explicit conferral of authority is not found here. The language which Blue Cross identifies as granting discretionary authority, and overcoming the default of de novo review, is contained in the Benefit Description.  It states that "Blue Cross and Blue Shield decides which covered services are medically necessary and appropriate for you."  There is no language in this plan which uses, or even connotes, the term "discretionary authority" or states that review will be under an arbitrary and capricious standard.

Other courts in this district have interpreted other Blue Cross plans with the "Blue Cross decides" language and found that they granted discretion.  However, those plans have paired the power to decide medical necessity with an explicit statement that full discretionary authority is vested in the plan administrator.  *See, e.g.*, *Smith*, 597 F. Supp. 2d at 219; *Island View Residential Treatment Center* v. *Blue Cross Blue Shield of*

*Mass., Inc.*, Civ. Action No. 07-10581-DPW, 2007 WL 4589335, at *17 (D. Mass. 2007), *aff'd* 548 F.3d 24 (1st Cir. 2008).  To be sure, no "magic words" are necessary for discretion to be granted.  *Gross* v. *Sun Life Assur. Co. of Canada*, 734 F.3d 1, 15-16 (1st Cir. 2013).  Accordingly, it cannot be that only the precise word "discretion" appearing in plan documents is sufficient to grant discretion.[6]  It is equally clear, however, that such magic words provide a safe harbor for plans seeking discretion.  *Brigham* v. *Sun Life of Canada*, 317 F.3d 72, 81 (1st Cir. 2003) ("wholly endors[ing]" model language for discretion).  This plan, without those words, differs significantly from the other Blue Cross plans interpreted in this district and presents the novel question whether a statement that Blue Cross "decides" medical necessity, standing alone, grants discretion.

The First Circuit in *Gross* v. *Sun Life Assurance Company of Canada*, 734 F.3d 1 (1st Cir. 2013) [hereinafter "*Gross I*"] provides the relevant framework for determining whether that phrase suffices.  In *Gross I*, the insurance policy at issue stated that "Proof [of claim] must be satisfactory to Sun Life," the plan administrator, and "Benefits are payable when Sun Life

---

[6] Nor can it be said that the difference between those Blue Cross plans and this one establishes an intent to grant discretion in some policies and not in this one.  That said, it is clear that Blue Cross knows how to use clear discretionary language when it wishes to do so.

receives satisfactory Proof of Claim." *Id.* at 11-12.  The First Circuit carefully considered whether the words "satisfactory" or "satisfactory to us" conferred discretionary authority on SunLife and concluded that ordinarily they do not.  The court held that "to secure discretionary review, a plan administrator must offer more than subtle inferences drawn from such unrevealing language" and decided that the phrase "satisfactory to us" was too ambiguous to afford a "*clear* grant of discretion." *Id.* at 15-16.

In analyzing whether the term "satisfactory to us" could grant discretion, the First Circuit cited with approval a series of judicial opinions that draw a critical distinction between the power to decide matters and full discretion in how to make decisions.  "[T]he critical question is whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case." *Diaz* v. *Prudential Ins. Co. of Am.*, 424 F.3d 635, 639-40 (7th Cir. 2005) *cited by Gross I*, 734 F.3d at 14.  After all, it is unremarkable – even unavoidable – that a plan administrator would decide eligibility matters.  "No plan provides benefits when the administrator thinks that benefits should not be paid." *Kinstler* v. *First*

*Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999), *cited by Gross I*, 734 F.3d 1 at 14.

Drawing this distinction makes clear that the language at issue here does not provide a clear grant of discretion.  It does not grant "latitude" but rather merely notes that Blue Cross, as opposed to some other entity, is the initial decision-maker.  Moreover, immediately after stating that Blue Cross decides medical necessity, the benefit description states that Blue Cross "will do this by using all the guidelines described below."  [AR 35].  Those guidelines appear objective and constraining, not discretionary; they include "generally accepted standards of medical practice," "medical technology assessment criteria," and factors like treatment "not more costly" than equally effective alternatives.  If anything, this language appears to apply "pre-set standards," not grant wide-ranging discretion.  In any case, it does not *clearly* grant Blue Cross discretion.  Under *Gross I*, this plan must be reviewed *de novo*.

## III. DISCUSSION

### A.  *Procedural Flaws*

Hatfield focuses his challenge of Blue Cross's denial of benefits decision on a number of alleged procedural deficiencies in the decisionmaking and review processes.  ERISA sets forth certain minimum procedural requirements for the denial of a

benefits claim.  *See DiGregorio* v. *Hartford Comp. Emp. Benefit Serv. Co.*, 423 F.3d 6, 13 (1st Cir. 2005) (citing *Halpin* v. *W.W. Grainger, Inc.*, 962 F.2d 685, 688-89 (7th Cir. 1992)). Specifically, a plan administrator must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  29 U.S.C. § 1133(1).  The accompanying regulations further provide that the notice of a denial of benefits make "specific reference to pertinent plan provisions on which the denial is based" and provide "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary," and "[a]ppropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review."  29 C.F.R. § 2560.503-1(g).  Where the claim is denied because the service was deemed not medically necessary, the notice must also provide "either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." 29 C.F.R. § 2560.503-1(g)(1)(v)(B).

In addition, every employee benefit plan must "afford a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2).  To meet this requirement, a plan must "establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination to an appropriate named fiduciary of the plan, and under which there will be a full and fair review of the claim and the adverse benefit determination."  29 C.F.R. § 2560.503-1(h)(1).

The Ninth Circuit succinctly captured the procedural requirements of ERISA, and its goals, in language that has since guided many federal courts.

> "In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries.  If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it.  There is nothing extraordinary about this; it's how civilized people communicate with each other regarding important matters."

*Booton* v. *Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997).  Hatfield alleges that while his dialogue with Blue Cross was lengthy and involved, it was unclear, unresponsive, and not enough to allow for either accurate benefit determinations or

adequate judicial review.  I turn now to Hatfield's specific complaints.

### 1. Notice of Contractual Reasons for Denial

In this litigation, Blue Cross advances multiple reasons for denying Hatfield's claim.  In addition to medical necessity, which was the focus of the internal review process, Blue Cross identifies three contractual reasons for denying his claim: that Hatfield did not receive prior approval for his stay at Burning Tree, as required; that out-of-network, out-of-region coverage was not provided except in cases of emergencies or urgent care, which this treatment was not; and that "ranches" like Burning Tree are explicitly excluded by the plan.  These contractual exclusions to his coverage are arguably sufficient to support a denial, regardless of whether his treatment was medically necessary.  Blue Cross urges that these independent bases for denial obviate any need to evaluate the process by which it reviewed Hatfield's claim.

These contractual bases for denial, however, are not necessarily properly raised in this litigation.  In a pair of cases, the First Circuit has held that plan administrators may not introduce in litigation new reasons for denying benefits that were not raised in the internal claims process.  *Glista* v. *Unum Life Ins. Co. of Am.*, 378 F.3d 113, 131 (1st Cir. 2004); *Bard* v. *Boston Shipping Ass'n*, 471 F.3d 229, 245 (1st Cir.

2006).  This limitation was recognized under the "equitable and common law powers" of the courts and consequently, within that broad direction the proper response to newly-raised claims is case-specific.  *Bard*, 471 F.3d at 244-45.  Even so, the principle that "sandbagging" claimants with new rationales is impermissible, given that the "need for clear notice pervades the ERISA regulatory structure," is well-established.  *Id.* at 237, 244.

Whether Blue Cross "sandbagged" Hatfield by belatedly introducing these contractual issues, however, is not as clear-cut as under the facts of *Glista* and *Bard*.  For while these contractual issues were not clearly raised in the denial of the claim directly at issue in this litigation, they were raised in response to related claims.  The record reflects that Hatfield possessed a letter denying a claim for benefits submitted by Burning Tree, dated July 30, 2010.  His father submitted this letter along with his September 28, 2010 claim for out-of-network benefits.  The July 2010 letter indicated that the treatment was not covered because it was out-of-state and not covered by the plan, and "the patient received these services either without a referral from their primary care physician or plan authorization."  In addition, the April 20, 2011 denial of benefits in response to Hatfield's mother's separate claim for psychiatric counseling for Hatfield at Burning Tree informed

Hatfield that the reason for denial was that the treatment was out-of-network.  The Hatfields had notice of at least some of these contractual limitations.  However, that notice does not necessarily extend to the relevant claim, due to the actions of Blue Cross itself.

After Blue Cross denied Hatfield's claim for psychiatric counseling at Burning Tree, a Blue Cross representative encouraged the Hatfields to submit a separate claim for acute residential treatment at Burning Tree.  Blue Cross gave them reason to believe that the form of their claim was wrong and that a claim which properly classified Burning Tree might be covered.  After then filing the claim for acute residential treatment and being denied solely on the basis of medical necessity, the Hatfields would have had sound reason to believe that medical necessity alone was the basis for the denial. *Compare Glista*, 378 F.3d at 129 ("a reasonable participant would have understood the denial to rest on the Treatment Clause alone."). The Hatfields could reasonably disregard the prior notice of contractual limitations, believing that they had complied with Blue Cross instructions on how to correct their claim.  As such, it is unsurprising that the record is bare of evidence showing why this Burning Tree should not be excluded although it is out-of-state and is located on a ranch.  This is precisely the kind of sandbagging with which the First Circuit

was concerned: Blue Cross "set in motion a chain of events whose effect was to shift the targets that [claimant] was aiming for, and then penalize [claimant] for aiming at the first round of targets." *Bard,* 471 F.3d 229 at 244 n.21. Hatfield deserves, at least, a chance to develop his arguments and marshal evidence against these reasons for a denial, and considering these exclusions on this record would deny him that chance.

The proper remedy for such sandbagging is a matter of "considerable discretion." *Buffonge* v. *Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005). Unlike in *Bard*, Hatfield was not induced to submit information harmful to his claim by the lack of notice on these contractual limitations. Rather, he only lost the opportunity to introduce evidence supporting coverage. Nor was there detrimental reliance, as in *Bard*. *Id.* at 245. Additionally, Hatfield was not entirely denied notice of the contractual limitations, even if that notice was rendered ineffective by subsequent communications from Blue Cross. The *Bard* remedy, in which the court entirely put aside the newly-raised reasons for denial and granted benefits based on the remaining reasons, is not appropriate here. Given that the contractual bases for denial are clearly implicated in Hatfield's claim, setting them aside entirely "might provide [claimant] with an economic windfall." *Buffonge*, 426 F.3d at

31-32.  The better response is "is to let [claimant] have the
benefit of an untainted process."  *Id.*

A remand is unnecessary, however, if the denial of benefits
can be upheld under *de novo* review on medical necessity grounds.
Accordingly, I now evaluate Blue Cross's denial of benefits, on
medical necessity grounds alone.

2.  Inadequate Notice of Denial

Hatfield argues that the notice of denial letters were
inadequate because they did not provide sufficiently clear or
specific reasons for the denial, did not cite specific plan
provisions on which the denial was based, and did not provide an
adequate explanation of the clinical judgment for the
determination.  *See* 29 C.F.R. §§ 2560.503-1(g)(1)(i)-(ii),
2560.503-1(g)(1)(v)(B).

Hatfield received four denial letters that set forth the
basis for the decision and articulated the reason for the denial
as the lack of medical necessity for an acute inpatient
treatment stay in light of Hatfield's potential safety risk and
relationships.  These letters were as follows.

The October 28, 2010 denial letter indicated that Blue
Cross used "the initial review InterQual Criteria" for reviewing
the necessity of "a substance abuse residential stay" and
specifically identified the relevant categories of criteria:
"potential safety risk, relationships, role performance, and

prior treatment."  It further stated that because of Blue
Cross's assessment of the potential safety risk and role
performance criteria, it had determined that outpatient therapy
visits were the appropriate level of care for Hatfield, and not
a residential stay.

The September 16, 2011 denial letter indicated that Blue
Cross conducted the review by applying "InterQual Criteria on
Chemical Dependency & Dual Diagnosis Inpatient level of care."
It explained that the claim was denied because an "acute
chemical dependency inpatient treatment stay" was not medically
necessary for Hatfield, based on his lack of an "immediate
safety risk."  The letter enclosed a copy of the InterQual
criteria and the relevant portions of the Plan Description, and
informed Hatfield of his right to an external review and the
process for obtaining one.

After Hatfield requested a reconsideration of that decision
and submitted additional information, Blue Cross sent a third
denial letter on November 16, 2011.  This letter stated that
benefits were denied because the treatment "does not meet the
medical necessity criteria required for coverage of an inpatient
chemical dependency rehabilitation stay in the areas of
potential safety risk and relationships."  Finally, the January
17, 2012 decision from MassPRO explained in depth the specific
medical records and documents reviewed and stated that MassPRO

27

agreed with Blue Cross "that Mr. Hatfield's condition does not meet the InterQual medical necessity criteria for admission to an acute residential level of care in the area of potential safety risk and relationships."

Some of Hatfield's complaints have little merit.  Courts have repeatedly upheld denial letters with similar levels of detail as providing sufficient explanations of the basis for a denial.  *See, e.g., Bonanno*, 2011 WL 4899902, at *10; *Island View*, 2007 WL 4589335, at *21.  While it is true that a layman might not know what "potential safety risk and relationships" really means, by pointing to, and including, the InterQual criteria, Blue Cross provided enough information for a claimant to understand his denial.  Giving a reason for the denial – lack of medical necessity, based on the InterQual criteria, and specifically the safety risk and relationships aspects of those criteria – is enough: "it is not necessary for an administrator to provide 'the reasoning behind the reasons.'"  *Mercier* v. *Boilermakers Apprenticeship & Training Fund*, 2009 WL 458556, at *17 (D. Mass. Feb. 10, 2009) (quoting *Gallo* v. *Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996)).  Blue Cross provided enough detail to allow "a sufficiently clear understanding of the administrator's position to permit effective review."  *Terry* v. *Bayer Corp.*, 145 F.3d 28, 39 (1st Cir. 1998), *quoting Halpin* v. *W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir. 1992).  For the

same reasons, minor inconsistencies in language across letters, where the same fundamental ideas are being conveyed, are not procedural violations under ERISA.[7]

Likewise, Blue Cross provided adequate reference to the plan provisions under which it was denying Hatfield's claim (putting aside the contractual limitations discussed in the previous section).  While the denial letters did not cite to the plan chapter-and-verse, each made clear that it was conducting a medical necessity review.  The Hatfields could understand – and appear actually to have understood – that the claim was being denied on medical necessity grounds.

In contrast, one pervasive inconsistency in the denial letters does render the notice provided inadequate.  From letter to letter, the Blue Cross reviewers either used different InterQual criteria or miscommunicated which criteria were being applied: the initial review or concurrent review criteria. Initial review is used to "determine whether the participant qualifies for admission to a particular type of treatment facility," while concurrent review is used to "determine whether a participant who initially qualified for admission to a

---

[7] For example, the variable references to "acute residential treatment," "inpatient chemical dependency treatment," "substance abuse inpatient treatment state," "acute chemical dependency inpatient treatment stay," and "inpatient chemical dependency rehabilitation stay," are largely inconsequential, where they all refer to the same level of care.

treatment facility qualifies for continued care in the facility." *Jon N.*, 684 F. Supp. 2d at 196.  The first letter, dated October 28, 2010, from Dr. Cremens, clearly states that BlueCross conducted an initial review.  However, the concurrent review criteria were attached to the second denial letter of September 16, 2011.  Defendants note that the record does not show whether the three reviewers other than Dr. Cremens used initial or concurrent review criteria.

The use of incorrect or inconsistent criteria could support a substantive challenge to a benefits determination, but it also poses procedural problems related to notice.  Blue Cross may not have been required to inform Hatfield of the specific InterQual criteria it applied in the first place – that may be a level of detail beyond what ERISA requires – but once it did so, the requirement of clear notice imposes an obligation not to confuse or mislead a claimant.  Shifting standards make it that much more difficult for a claimant to determine what materials he should submit on his own behalf and how to press his own claims in the administrative process.  In this respect, inconsistently applied or improperly attached InterQual criteria present the potential for "sandbagging," albeit one, in this case, not necessarily misleading in some fundamental sense.  However, these shifting or miscommunicated standards impede the development in this case of a clear record for effective review.

While this is far from an egregious notice violation,
neither is it merely a "technical" violation of the regulations.
*McCarthy* v. *Commerce Grp., Inc.*, 831 F. Supp. 2d 459, 488-89 (D.
Mass. 2011).  The purpose of ERISA's notice provisions is "to
notify the claimant of what he or she will need to do to
effectively make out a benefits claim and to take an
administrative appeal from a denial."  *Bard*, 471 F.3d at 239.
The denial letters sent by Blue Cross fell short of that
standard, introducing confusion and inconsistencies under the
surface of clarity.

### 3.  Failure to Gather and Request Sufficient Information

Hatfield also contends that Blue Cross failed to ask
Hatfield for the additional documentation it needed to make a
fully-informed coverage decision.  This obligation stems from
both the regulations, which require notice of "any additional
material or information necessary for the claimant to perfect
the claim," 29 C.F.R. § 2560.503-1(g)(iii), and the Plan
Description, which provides that "[i]f Blue Cross and Blue
Shield needs more information to make a final determination for
[the] claim, [it] will ask for the information or records it
needs."

There is substantial evidence in the record that, at least
in the earlier stages of the administrative process, Blue Cross
was missing important information about Hatfield and the medical

necessity for his claim.  The first Blue Cross reviewer indicated that it was "unclear if [patient] met ART [acute residential treatment] dual criteria as minimal information provided in medical record."  The November 2011 reviewer notes further stated that "the record from Burning Tree contains minimal clinical information" and "there is no information to meet 05 ACDD IQ Criteria for ART LOC in terms of potential safety risk or relationships."  Blue Cross, however, contends these reviewers were indicating the information was insufficient to satisfy the criteria for medical necessity, not that it was insufficient to reach a decision.  Additional materials were submitted over the course of the review process and only the final, external reviewer had the benefit of all of the Hatfields' submissions – and not all of those, including the medical records of Hatfield's long-term treating physician, even ended up in the administrative record.[8]

Although this additional information existed, and might have proven relevant to a medical necessity determination, Blue Cross did not ask for it in any of its denial letters.  At most,

_____

[8] The record is somewhat unclear regarding exactly what MassPro reviewed, due in part to what appears to be an error in dating MassPro's letter affirming the denial of benefits.  That letter is dated January 17, 2012, but refers to new materials submitted on January 19, 2012 and January 30, 2012, including information from Hatfield's previous treating physicians and additional records from Burning Tree.

Blue Cross offered Hatfield a rote invitation to submit "other information you'd like us to review."  In an email exchange in October, 2011 – separate from the denial letters and subsequent to two of them – Blue Cross suggested to Mr. Hatfield that he submit the complete medical records from Burning Tree.  This shows an effort to secure additional relevant information, but by the same token, it also shows a failure to have done so previously or in the denial letters themselves.  *Cf. Halpin* v. *W.W. Grainger, Inc.*, 962 F.2d 685, 693 (7th Cir. 1992)("Nor are the defects cured by the later correspondence. With respect to this correspondence, we note that the regulations require that the denial letter itself contain specific reasons.").

Blue Cross perhaps ought to have asked Hatfield for more information earlier, as a matter of clear and open communication.  Its behavior fell well short of the aspiration of a meaningful dialogue in this respect.  However, in the First Circuit, these shortcomings do not amount to an ERISA violation. The First Circuit has suggested that the regulatory requirement to describe what additional information is necessary to "perfect the claim" does not impose an obligation to gather additional substantive information.  "Perfect the claim," the court wrote is not "synonymous with 'win the appeal.'"  *Terry*, 145 F.3d at 39.  Perfection, instead, refers to completing a claim – and a complete claim can still be denied.  *Id.* at 39 n. 8.

This interpretation of the regulation is arguably dicta, because the First Circuit's holding turned on a lack of prejudice. At least one Judge in this district thereafter did not read *Terry* to excuse an administrator's failure to gather information. *Estrella* v. *Hartford Life & Acc. Ins. Co.*, No. CIV.A. 09-11824-RWZ, 2011 WL 4007679, at *6 (D. Mass. Sept. 6, 2011); *but see Dickerson* v. *Prudential Life Ins. Co. of Am.*, 574 F. Supp. 2d 239, 248 (D. Mass. 2008)(holding that *Terry* means an administrator did not need to suggest "what type of information might be helpful in appealing [its] determination"). Other courts outside this circuit have read this regulation to impose an obligation on plan administrators to explain, with specificity, what information might help improve an eligibility determination. *See, e.g., Wolfe* v. *J.C. Penney Co.*, 710 F.2d 388, 393 (7th Cir. 1983) ("a fiduciary (or its agent) ought to specify with some detail what type of information would help to resolve these questions, and how the applicant should present such information"); *Tinker* v. *Versata, Inc. Grp. Disability Income Ins. Plan*, 566 F. Supp. 2d 1158, 1164 (E.D. Cal. 2008) (allowing claimant to submit unspecified "additional medical information" insufficient). Even so, the First Circuit has spoken on the meaning of this provision and I follow their considered interpretation. Accordingly, since Hatfield's claim was already complete, albeit poorly documented, Blue Cross did

not violate its obligation to tell him how to perfect his claim in a fashion that would alone justify an adverse judgment on its determination.

### 4. Prejudice

Having found certain procedural inadequacies in the determination of medical necessity, I turn to whether Hatfield has also demonstrated prejudice sufficient to justify a remand. *DiGregorio*, 423 F.3d at 16 (quoting *Recupero* v. *New Eng. Tel. & Tel. Co.*, 118 F.3d 820, 840 (1st Cir. 1997)).  A showing of prejudice is required for a remedy because "ERISA's notice requirements are not meant to create a system of strict liability for formal notice failures."  *Terry*, 145 F.3d at 39. To show prejudice, a claimant "need not prove that a different outcome would have resulted had the [administrator] followed the required procedures."  *McCarthy*, 831 F. Supp. 2d at 488-89, *citing Buffonge*, 426 F.3d at 30.  A showing that the procedural violations "were serious, had a connection to the substantive decision reached, and call into question the integrity of the benefits-denial decision itself" certainly suffices, *Bard*, 471 F.3d at 244, but is more prejudice than necessary for a claimant to show.  A claimant must show prejudice "in a relevant sense" and that correct notice "would have made a difference." *Recupero*, 118 F.3d at 840.

I do not find prejudice on the order of magnitude recognized in *Bard*: nothing in the record reveals an entirely broken process for determining benefit eligibility.  But some prejudice – enough to warrant a remand – has resulted from the procedural defects of Blue Cross's denials.[9]  I have already noted the harm of confusion generated by the inconsistent use or description of the InterQual criteria being used.  More prejudicial still is the state of the administrative record that has resulted from the substandard and non-compliant procedures used by Blue Cross.  I am tasked with conducting a *de novo* review of the claim and am to "independently weigh the facts and opinions in the administrative record to determine whether the claimant has met [his] burden of showing" coverage. *Gross I*, 734 F.3d at 17.  But the record on which I must rely is lacking much of the most important information I would seek to examine, including the medical criteria applied by Blue Cross and

---

[9] I find nothing prejudicial identified in Hatfield's fleeting assertion that Blue Cross failed to "[p]rovide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination." *See* 29 C.F.R. § 2560.503-1(h)(3)(iv).  Although the denial letters are signed by reviewing physicians, the managed care worksheet indicates that other physicians participated in the review of the denial of benefits.  It appears that their names were not disclosed to Hatfield — an apparent technical violation of the regulations but one with limited if any impact.  In any event, Hatfield does not appear to pursue this claim further.

Hatfield's full medical records from the period before his
treatment at Burning Tree.  Any review I would undertake is
hampered – to Hatfield's detriment, as the party seeking to
establish eligibility – by the absence of a more complete
record.  Better notice and better communication throughout the
administrative process would have developed a better record,
which could only help Hatfield (it may not be enough to allow
him to establish coverage, of course, but it need not be to
support remand).  An inadequate record, stemming from procedural
flaws, justifies a remedy.  *See Gross* v. *Sun Life Assur. Co. of
Canada* [hereinafter "*Gross II*"], 763 F.3d 73, 75 (1st Cir. 2014)
("We also found the administrative record inadequate to permit
our de novo judgment on Gross's entitlement to benefits.
Accordingly, we remanded the matter for further proceedings.").

**B.    *Remedy***

   1.    Remand

      Given the nature of Blue Cross's procedural violations of
ERISA, which were meaningful but not severe, the proper remedy
is a remand for further proceedings.  A substantive decision, by
this court, granting the benefits sought by Hatfield is
inappropriate, not only because of the limited inadequacies of
the record but because it would offer too much relief.  The
evidence here does not "compel[] the conclusion that [he] is
entitled to benefits." *Bard*, 471 F.3d at 245-46.  Indeed, as a

general rule, "ERISA trusts plan administrators to make the first determination as to the availability of benefits" and so remand is often a favored remedy. *Glista*, 378 F.3d at 132 (1st Cir. 2004).

However, a remand is particularly appropriate, although not required, in a case like this one; a substantive remedy is poorly tailored to a procedural violation.  Here, the claimant's legitimate claims are best vindicated, and other plan participants are best protected, by providing him with the full and fair process which he was denied.  Because I will order a remand to Blue Cross for further administrative review, I do not address Hatfield's substantive claims for coverage.

The parties disagree over the proper scope of review upon remand.  Hatfield argues that the remand should be limited to the question of medical necessity and that the contractual limitations on coverage which were not raised in the initial administrative review cannot now be raised upon remand.  I may have the power to limit the scope of the remand in this way. *Glista* holds that the courts' remedial power under ERISA "encompasses an array of possible responses when the plan administrator relies in litigation on a reason not articulated to the claimant."  378 F.3d at 131.  Regardless of whether I may limit the remand to medical necessity, I do not find that remedy appropriate.  Such a remedy would also have the effect,

indirectly, of giving a form of substantive relief for a
procedural violation.  Hatfield is not entitled to, for example,
treatment at an excluded "ranch" program simply because there
was inadequate notice of the bases of his denial.  A remedy that
could provide such a windfall is to be avoided.  *Buffonge*, 426
F.3d 20, 31-32.

But conversely, Hatfield must have a full opportunity to
submit new information into the record, both on the medical
necessity issues that were clumsily raised in the first instance
and on the contractual limitations that could be raised upon
remand.  Without a chance to show contractual coverage and
medical necessity, Hatfield would suffer the prejudice of having
been "sandbagged" and left with an inadequate record.
Consequently, I remand to Blue Cross for a fresh determination
on Hatfield's claim, with the opportunity for the parties to
raise all relevant arguments and introduce all relevant
information.

### 2.   Attorney's Fees

Plaintiff also seeks attorney's fees under § 1132(g).  At
issue is both whether fees are available in connection with the
general disposition of this case, where there has been only a
remand, and whether fees are justified on the particular facts
of this case.  Plaintiff's eligibility for attorney's fees is
increasingly clear, although not altogether resolved, in light

of a growing body of case law.  The Supreme Court recently clarified that a party need not be a "prevailing party" to be eligible for attorney's fees under under § 1132(g)(1); rather, they only must show "some degree of success on the merits." *Hardt* v. *Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010).  The Court expressly declined to decide whether "whether a remand order, without more, constitutes 'some success on the merits' sufficient to make a party eligible for attorney's fees under § 1132(g)(1)." *Id.* at 256.

The First Circuit has offered a clear answer to that question, albeit in explicitly-identified dicta, writing that while "it is unnecessary for us to adopt a position on whether remand alone is enough to trigger fees eligibility," a remand "ordinarily will reflect the court's judgment that the plaintiff's claim is sufficiently meritorious that it must be reevaluated fairly and fully" and can allow for an award of attorney's fees.  *Gross II*, 763 F.3d at 78.  As the First Circuit explained, "a remand for a second look at the merits of her benefits application is often the best outcome that a claimant can reasonably hope to achieve from the courts" and will generally qualify as some success on the merits.  *Id*.  The First Circuit contrasted a remand with "interim, 'procedural' victories such as a favorable ruling on a discovery dispute or a motion to intervene."  *Id*. at 80.

Judges in this district, myself included, have followed the First Circuit's suggestion and found that remands open the door to awards of attorney's fees under ERISA.  See *Petrone*, 2014 WL 1323751, at *2 ("the prevailing lower court wisdom appears to be that a remand of an ERISA challenge may trigger a fee award in favor of the plaintiff under § 1132(g)") (Woodlock, J.); *Cannon* v. *Aetna Life Ins. Co.*, No. CIV.A. 12-10512-DJC, 2014 WL 5487703, at *3 (D. Mass. May 28, 2014) ("remand provided a meaningful benefit") (Casper, J.); *McCarthy*, 831 F. Supp. 2d at 493 ("Plaintiff is entitled to an award of reasonable attorneys' fees") (Saris, J.).  I will continue to follow this approach. Returning a claim to the entity primarily tasked with determining benefit eligibility, along with an order to provide beneficiaries with all the procedural protections to which they are entitled, is an important measure of success in a scheme in which the federal courts sit in a quasi-appellate role.

Eligibility for attorney's fees is not sufficient to entitle a party actually to receive attorney's fees, however, and in the First Circuit, a five-factor test is used to review fee requests under ERISA.  *Gross II*, 763 F.3d at 83, citing *Cottrill* v. *Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d, 220, 225 (1st Cir. 1996).  The factors are:

> (1) the degree of culpability or bad faith attributable to the losing party; (2) the depth of the losing party's pocket, i.e., his or her capacity to pay an award; (3) the

extent (if at all) to which such an award would deter other persons acting under similar circumstances; (4) the benefit (if any) that the successful suit confers on plan participants or beneficiaries generally; and (5) the relative merit of the parties' positions.

*Id.*

This test is only a guide.  No single factor is determinative, not every factor must be considered in every case, and additional factors should be considered where relevant.  *Id.*

Here, the first factor weighs slightly in favor of granting fees.  In finding a need for a remand, I have implicitly found culpability, "at least to the bases for remand." *Cannon*, 2014 WL 5487703 at *4.  Even in the absence of bad faith, of which there is no evidence here, this, "at a minimum does not weigh against some award of attorneys' fees." *Id.  See also Gross II*, 763 F.3d at 83, *citing Janeiro* v. *Urological Surgery Professional Ass'n*, 457 F.3d 130, 143 (1st Cir. 2006)(stating that it is unnecessary "to find that defendants acted with an especially high degree of culpability").  The second factor, the ability of defendants to pay the award, likewise weighs slightly in plaintiff's favor; indeed, defendants do not contest their ability to pay.  That said, "capacity to pay, by itself, does not justify an award." *Cottrill*, 100 F.3d at 226–27. Deterrence, the third factor, weighs in plaintiff's favor.  The First Circuit has recognized the value of motivating fiduciaries

to comply more attentively with the procedural obligations imposed by ERISA, including through the development of complete administrative records, even when weighed against the important obligation to protect resources for the claims of other beneficiaries. *See generally Gross II*, 763 F.3d at 84-85. Providing such deterrence can serve as a benefit to plan participants generally, the fourth factor. *Cannon*, 2014 WL 5487703 at *4 ("the result here provides a common benefit to all Plan participants—the right to full and fair review of their claims"). Moreover, by achieving success on the standard of review, Hatfield "strengthens the entitlement to benefits for employees covered by such policies." *Gross II*, 763 F.3d at 85.

Finally, the relative merits of the parties' positions are analogous to those in *Gross II*. Like the beneficiary there, Hatfield has not established any right to benefits yet and may fall short on remand. Like the beneficiary there, Hatfield has only achieved a partial victory. While the Court in *Gross II* ruled against the beneficiary on certain claims, I have not done so here. Nevertheless, I must note the many obstacles between Hatfield and a favorable decision on remand. As in *Gross II*, these weaknesses in the merits of Hatfield's case are placed against his real success in securing a remand. And as in *Gross II*, plaintiff's mixed, if not poor, showing on the fifth factor does not bar recovery of attorney's fees. "Having achieved

43

adequate success under *Hardt* to establish eligibility for fees,
[claimant] may not be denied a fee award based solely on the
fact that [he] did not have greater success." *Gross II*, 763 F.3d
at 85.   Taking the five factors together, in a context in which
remand is a partial victory on the merits, Hatfield is entitled
to an award of reasonable attorney's fees.   I will invite a
submission from Hatfield to initiate proceedings regarding the
appropriate amount of those fees.

### IV. CONCLUSION

Hatfield ultimately may not be entitled to coverage for his
treatment at Burning Tree.   But he has been denied the
procedural protections guaranteed to him by ERISA that would
allow him effectively to press his case for coverage.   I will
remand the claim to Blue Cross in order to allow for all
relevant issues to be raised and all relevant information to be
entered into the record, but do not make any substantive
determination about Hatfield's coverage.   I will also consider
an award of reasonable attorney's fees in connection with
Hatfield's partial success on the merits in this litigation.

Accordingly, it is ORDERED that this matter be REMANDED for
further proceedings not inconsistent with this Memorandum, and

It is FURTHER ORDERED that on or before March 18, 2016 Hatfield submit a fully supported submission for the award of attorney's fees.  The defendants may file a response on or before April 8, 2016.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE